## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **SANDRA HUMPHREY,** | ) | |
| | ) | |
| **Claimant**, | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 16-BE-0043-M** |
| **NANCY A. BERRYHILL**, | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On April 18, 2012, the claimant, Sandra Humphrey, applied for a period of disability and disability insurance benefits under Title XVI of the Social Security Act.[1] (R. 116, 192-98). The claimant alleges disability commencing on January 25, 2012 because of depression, fibromyalgia, back problems, and being a slow learner. (R. 192, 246). The Commissioner denied the claim both initially and on reconsideration. (R. 136-41). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on January 17, 2014. (R. 79-98, 146-47).

In a decision dated March 26, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act. (R. 57-74). On November 9, 2015, the Appeals Council denied

---

[1] The claimant had filed a previous application for disability in March of 2010, alleging an onset date of February 18, 2010. At the subsequent hearing on that claim, the claimant requested a closed period of disability from February 18, 2010 through April 1, 2011, given that she had returned to work on April 1, 2011. The ALJ granted the request and issued a favorable decision on January 23, 2012 for the requested closed period of disability. (R. 60, 104-115).

the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and appeals from the final decision denying her claims.  This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).

After the filing of this appeal, the claimant filed a motion to remand pursuant to Social Security Ruling 16-3P.  (Doc. 14).

For the reasons stated below, this court WILL DENY the motion to remand based on Social Security Ruling 16-3p; however, it WILL REVERSE and REMAND the decision of the Commissioner for consideration of the additional evidence presented to the Appeals Council.

## II. ISSUES PRESENTED[2]

1. Whether this court should remand this matter to the ALJ for further proceedings consistent with Social Security Ruling 16-3p.

2. Whether the Appeals Council erred in refusing to review certain medical records submitted subsequent to the ALJ's opinion, and in failing to remand the matter to the ALJ.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[2] The claimant raises other issues; however, in light of this court's ruling on the second issue listed, the court does not reach those issues.  Those issues that the court does not reach are: whether the claimant meets Listing 1.04; whether the ALJ failed to accord proper weight to the opinion of consulting physician Dr. Harris; and whether, in her pain standard analysis, the ALJ failed to state adequate reasons for finding the claimant's subjective testimony to be unsupported.

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the

3

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to " engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months...." 42

U.S.C. § 423(d) (1) (A). To make this determination the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability. A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

## V. FACTS

### A. *Background*

The claimant was forty-one years old at the time of the ALJ's decision. (R. 74). She had

completed the seventh grade, and attended special education classes from 1982 to 1987. (R. 246-

47). When she received an evaluation from Psychologist Dr. Kline, she denied being in special

---

[3]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case
(SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are
appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir.
1981)(Unit A).

education classes at school (R. 480); however, when Psychologist Dr. Wilson examined her, she claimed that she was in special education.  (R. 597).  Records that appear to be for 7th grade at St. Clair County High School for two consecutive years,  86-87 and 87-88,  show the letters "L.D." next to her English and math classes, which suggests that she was considered learning disabled. (R. 595).  She never received a GED.  (R. 597).

Her past relevant work positions were cashier and  fry cook.  She advised Dr. Kline that the latter job ended in January 2012 when the business closed  (R. 95, 480); however, she told Dr. Wilson that she had to stop her last job at a convenience store/restaurant "because she could not unload the trucks." (R. 597).

*B.  Medical History - ALJ's Record*

*1.  Physical*

*a. Bronchitis*

Although the claimant has a history of bronchitis, the record reflected no hospitalization treatment for that condition since August 31, 2008, and a chest x-ray on that date was negative. (R. 328).  In February of 2010, before back surgery, the chest x-ray showed that the lungs were clear with no pleural effusion.  (R. 346).

 Subsequent records from INRI Medical Associates of Pell City, Alabama reflected some complaints of cough, faint wheezes, and chest congestion, but no subsequent diagnoses of bronchitis.  (R. 368-408).

On December 15, 2012, February 23, 2013 and August 29, 2013, records from Northside Medical Associates in Pell City, Alabama and the claimant's family practice doctor, Michael Dupre, indicate that the claimant was treated for cough, chest congestion and sinus pressure and

received a diagnosis of acute bronchitis, but that the symptoms apparently resolved with injections and medications, because the follow up treatment did not show further problems.  (R. 511, 519, 521).

### b. Orthopedic Matters:  Low Back Pain and Foot Problems

The record reflected that the claimant has received years of treatment for low back pain. Before July of 2009, she had a fusion of her lumbar spine on the left at the L5-SI level.  On July 13, 2009, after looking at x-rays and a lumbar CT of the area, Dr. Jeffrey Todd Smith, a treating orthopedic surgeon, recommended removal of the fusion screws and a revision decompression on the right of the lumbar area.  On February 18, 2010, the claimant returned with low back and right lower extremity pain, and Dr. Smith performed the recommended back surgery.  By April of 2010, she reported pain in the neck and bilateral hips and received a diagnosis of bursitis.  Over the next few months through October of 2010, she returned with low back and right pain and hip pain and received several pain injections for the diagnosis of chronic right hip trochanteric bursitis (inflammation of the bursa at the outside point of the hip) with right posterior trigger point over the PSIS (the posterior superior iliac spine, part of the hip bone).   (R. 329-356; 357-367).

Records from the family practitioner Michael Dupre reflected that he treated her from July 2012 through December of 2013 for a variety of problems, and, although he is not an orthopedist, his records included references to her history of back surgery and her back pain.  (R. 507-531).

From January to May of 2012, pain specialist Dr. Michael Scott Kendrick treated her for post laminectomy syndrome, a condition characterized by persistent pain following back

surgeries.  He treated her with medication, epidural steroid injections and a TENS unit, and the examination on May 31, 2012 reflected that she walked with an antalgic gait that characterizes those in pain with the bearing of weight, and that she complained of pain with motion in extension, flexion and static tests.  (R. 419-473).

Records from a second pain center, Greystone Neurology and Pain Center, showed that the center treated Ms. Humphrey from July of 2012 through January of 2014.  The first notes from Dr. Dayna London, a physical medicine and rehabilitation specialist at the center, indicated that the claimant had a mild antalgic gate and that she was unable to heel and toe walk without difficulty.  The doctor noted tenderness around the L4-5 area with muscle tenderness in the area as well as tenderness in the right sacral sulcus, right gluteal muscle and right greater trochanter.  She also noted that the lumbar extension was severely reduced with pain and mild reduction in the lumbar extension with right and left rotations.  The claimant received various pain medications, including Lortab.  (R. 475-77).

Dr. London ordered a nerve conduction study and an electromyogram that occurred on August 1, 2012; this testing was to evaluate lumbar radiculopathy (a condition in which a compressed nerve in the spine can cause pain, numbness, tingling or weakness along the course of the nerve) vs mononeuropathy (a condition in which only a single nerve or nerve group is damaged) and how well the nerves can send electrical signals, but the test showed normal results. (R. 586).

Follow up appointments occurred on August 1, 2012; August 8, 2012; August 15, 2012; September 12, 2012; April 24, 2013; April 29, 2013; May 8, 2013; and June 6, 2013.  Although Dr. London referred the claimant to Behavioral Health for depression and  "strongly encouraged"

7

the claimant in August of 2012 to maintain her scheduled psychologist appointment, the claimant

later advised the doctor that she was unable to do so because of the cost and travel distance.  In

2013, Dr. London discontinued Lortab prescriptions and ordered oral methadone, stating that she

would transition to a long-acting pain medication for decreased tolerance and better pain control.

However, the doctor subsequently prescribed MS Contin, an opioid for severe pain needing daily,

around-the-clock treatment, and the claimant stated that she tolerated her pain better with MS

Contin, but that the pain was not well controlled for 12 hours. The claimant did not go to the

MRI scheduled in May of 2013 and was unable to find a psychologist in her area as of June of

2013.  (R. 550-594).  The chart notes from January 13, 2014 listed the following "confirmed"

problems/diagnoses: cervical disc degeneration; chronic pain; carpal tunnel syndrome;

depression; fibromyalgia; hypertension; lumbar spondylosis; metatarsal ununited fracture; post

laminectomy syndrome; radiculitis lumbosacral; spondylolisthesis of lumbar region; and listed

COPD and chronic low back pain as resolved from lumbar surgery.  (R. 551).

     In the most recent chart notes from Dr. London for June 6, 2013, the claimant complained

of back pain rated 7/10 and claimed it was worsening, but also stated that she had improvement

in her pain with MS Contin.  She ambulated with a mild antalgic gait.  Her cervical range of

motion was within normal limits and pain free.  In her lumbar region,  her forward flexion was

mildly decreased and pain free; her lumbar exension was moderately decreased and pain free; her

right hip was normal range of motion, and she had normal motor function.  She had no

tenderness in her sacral sulcus, her gluteal muscle, but she did have tenderness in her right

trapezius and right greater trochanter. (R. 550-553).

     From February of 2012 through September of 2013, Dr. Srinivas Mallempati, who

8

specializes in physical medicine and rehabilitation with an orthopedic group, treated the claimant for pain in the lower back radiating down both legs.  In February of 2012, she rated her pain level at 7/10 with constant, burning pain, and claimed that her symptoms stemmed from a slip-and-fall accident that occurred at her home on September 25, 2011.  She was able to sit for 15 minutes at a time, and indicated that activity did not improve or worsen the symptoms.  She claimed to receive some but not a lot of relief from her medications: Nycynta, an extended release opioid; Cyclobenzaprine, a muscle relaxant that blocks pain; and Meloxicam, a nonsteroidal anti-inflammatory drug used to treat pain.  (R. 506).  Dr. Mallempati reviewed old lumbar spine x-rays performed in October of 2010 and ordered new x-rays but saw no changes.  He interpreted the 2010 x-rays as showing degenerative disc disease with mild listhesis (slipping of the back vertebra resulting from a fracture and/or defect of the wing-shaped bones of the vertebrae) at L4/5 and a fusion at L5/SI.  The doctor also reviewed the October 2010 MRI of the lumbar spine and found that it also revealed degenerative disc disease with high intensity zone finding (tear in the outer ring fibers of the vertebral disc) at L4/5 and the fusion at L5/SI.  Dr. Mallempati opined that the pain was coming from the L4/5 disc, although it could be coming from the surgery area at L5/SI, and he ordered an epidural pain block. (R. 501-502, 506).

A year and a half later, in September of 2013, the claimant returned to Dr. Mallempati, complaining of pain of 7/10 and complaining that her pain was now worsened with activity.  She listed her current pain medications as Cyclobenzaprine, Nucynta, Meloxicam, Lyrica (an anti-convulsant medicine also used for pain relief), Lortab (containing hydrocodone as an opioid pain medication, and acetaminophen), and  Zanaflex (a muscle relaxer).  The patient advised Dr. Mallempati at one point that she did not want to see Dr. Kendrick anymore for pain management,

and, as reflected below, she began seeing Dr. Matthew Bennett for that service.  Dr. Mallempati ordered a new MRI to rule out disc herniation or other problems since the last MRI, and asked the patient to return when the results were available.  The doctor's records do not reflect that she returned.  (R. 504-05).

In September of 2013, the claimant also went to third pain consultant.  She first visited her family practice doctor, Dr. Dupre, who referred her to treating pain consultant Dr. Matthew Bennett.  (R. 508).  Dr. Bennett's records reflected that he treated her from September of 2013 until January of 2014.  He prescribed Lortab and, on other occasions, Norco, for her lower back pain, which she claimed to be continuous.  She stated on various visits that the medications relieved her by 40-60%, and claimed to suffer no medication side effects.  She claimed to average 5 hours of sleep per night, waking up at night from the pain.  Her pain ratings ranged from 6/10-8/10, and she listed exacerbating factors as lying flat, prolongerd sitting, standing, and walking.  The doctor initially stated diagnoses of fibromyalgia, back pain, leg pain and chronic pain syndrome, but the more recent visits omitted fibromyalgia as a diagnosis and listed only back pain, chronic pain syndrome and chronic opioid dependency.  (R. 532-548).

As for foot problems, the claimant complained of pain in her left ankle and had an x-ray of her left foot on August 1, 2012 showing a chronic ununited bone fragment at the base of her fifth metatarsal, but no acute fracture or subluxation.  The claimant did not undergo physical therapy because of costs.  Subsequent medical records reflected that she sometimes walked with a mild antalgic gait to avoid pain, and her primary complaint remained back pain.  The cause of her antalgic gait was not identified as relating to her left foot problem, because treating records at the end of 2012 and beyond referred to back pain but did not refer to foot and ankle pain.  (R.

550-81).  The late 2012 and 2013 treating records stated that the claimant walked for exercise 5-6 times per week and occasionally referred to a normal gait.  (R. 552, 553, 558-59, 563, 566-67*)*.

In September of 2013, at the request of the Commissioner, Dr. Rex Harris, another orthopedic surgeon, performed a consultative musculoskeletal examination of the claimant.  In the "Medical Source Statement of Ability to Do Work-Related Activities (Physical) (MSS)," Dr. Harris stated that she was capable of sedentary work and made the following specific determinations based on limitations that he found had lasted or would last for 12 consecutive months: the claimant can occasionally lift and /or carry up to 10 pounds; sit for 15 minutes at a time without interruption for a total of 3 hours in an 8-hour work day; stand for 5 minutes at a time without interruption for a total of 2 hours in an 8-hour work day; walk for 5 minutes at a time without interruption for a total of 1 hour in an 8-hour work day, *with the remaining 2 hours of the 8-hour work day spent at rest.*  The doctor opined that, in light of her back pain, she could occasionally do the following: use both hands for reaching (including overhead*),* handling, fingering, feeling, for pushing/pulling; use both feet for operation of foot controls; climb stairs and ramps; and tolerate exposure to operating a motor vehicle, humidity/wetness, dust, odor, fumes, and pulmonary irritants, extreme cold/heat, and vibrations.  He found that, because of her back pain, she could never climb stairs or scaffolds, balance, stoop, kneel, crouch, or crawl nor could she ever tolerate exposures to unprotected heights and moving mechanical parts.  (R. 482-90).

Finally, Dr. Harris determined that the claimant is able to perform the following activities: shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, 2 canes or 2 crutches; walk a block at a reasonable pace despite uneven or

rough surfaces; use standard public transportation; climb a few steps with the use of a hand rail; prepare simple meals; care for her personal hygiene; and sort, handle or use paper/files. (R. 482-90).

On the other hand, Andrea Files, a disability adjudicator, found  that the claimant had the following exertional limitations: lifting–occasionally 20 pounds and frequently 10 pounds; stand and/or walk 6 hours in an 8-hour work day; sit 6 hours in an 8-hour work day; and push and/or pull ability limited in both upper extremities and perhaps in both feet (unclear).  As to the claimant's postural limitations, the adjudicator found that the claimant had an unlimited ability to climb ramps or stairs but could never climb ladders, ropes or scaffolds; and had unlimited balancing, stooping, kneeling, crouching, and crawling abilities.  As to the claimant's manipulative limitations, she found that the claimant could never reach overhead; and had unlimited ability for finger manipulation.  As to the claimant's environmental limitations, she found that the claimant must avoid concentrated exoposure to extreme heat or cold and avoid all exposure to hazardous machinery and unprotected heights.  (R. 123-4).

   *c. Sinusitis*

Dr. Scott Elledge, a treating Ear, Nose and Throat Physician, performed nasal surgery on the claimant in August 12, 2013 because of her history of chronic nasal obstruction.   Dr. Elledge gave her a post-surgery diagnosis of sinusitis in August of 2013, but the claimant did not return for an appointment to follow up on that condition.  (R. 491-98).  Office records from INRI Medical Associates of Pell City, Alabama reflected that she received treatment for cough, sinusitis and rhinitis in May of 2012, before her nasal surgery. (R. 368-418).

The claimant also received sinus treatment from her family practice group of physicians,

12

Northside Medical Associates, on the following dates: December 15, 2012, February 23, 2013, July 19, 2013, August 27, 2013, August 29, 2013, September 4, 2013.  The August and September of 2013 dates were post-surgery visits, but a few weeks after the surgery, the Northside medical records do not reveal further sinus complaints. (R. 509, 512, 513, 516, 520)

   *2.  Mental - ALJ's Record*

   In many of her treatment records, the claimant denied anxiety, depression, and sleep disturbances and other psychological symptoms, and the doctors noted normal affect and mood and appearance.  (*e.g.,* R. 423,510, 517).  However, on August 20, 2012, Dr. Michael Dupre and Emily Bernstein, CNP of Northside Medical Associates assessed the claimant as having an adjustment disorder with anxiety.  (R. 524).  The claimant received several prescriptions for Pristiq, an antidepressant, although many of the subsequent chart notes reflected no psychological problems. (*E.g.,* R. 508, 509-510, 513, 516, 517, 519-520, 522, 525).

   On September 29, 2012, Dr. R. J. Kline, a psychologist, examined the claimant and determined that she had no psychiatric disorder and no history of mental retardation with low-average intelligence; he placed her Global Assessment of Functioning at 78 with adequate effort and motivation.  He assessed her as having a moderate to marked restriction of activities; no restriction of interests; no restriction in her ability to relate to others; normal ability to understand, carry out, and remember instructions; normal ability to respond appropriately to supervision, co-workers, and work pressures in a work setting; and adequate ability to function independently.  Dr. Kline opined that her mental problems did not limit her ability to function at work.  The claimant acknowledged to Dr. Kline that the only problems limiting her function were physical ones.  (R. 480-81).

Although she received referrals to psychologists for mental evaluation, the claimant did not present for mental evaluations until after the ALJ issued her opinion in March of 2014.

In October of 2012, Dr. Robert Estock reviewed the claimant's records and determined that the evidence reflected no mental medically determinable impairments.  He noted that, although the claimant alleges depression, no diagnosis of mental impairment is listed in the file and that Dr. Kline's consultative examination dated September 29, 2012 includes no diagnosis of mental impairment.  (R. 121).

### C.  Hearing Testimony

On January 17, 2014, the ALJ held a video hearing with the following testimony:

### 1.  Ms. Humphrey's Testimony

Ms. Humphrey testified that she has lived with her mother since the separation from her husband.  She leaves her home about twice or three times a month to see a doctor.  She has a driver's license but does not drive often.  She claimed that she can walk less than half a block at a time because of her back and foot pain.  (R. 82-84, 87).

She stated that, since her last period of disability, the pain in her back and legs had worsened, and that the pain management helped but did not take the pain away.  She claimed to lie down approximately 80 percent of the day, and claimed not to sleep well at night.  (Ra. 85-86).

As to her foot problem, Ms. Humphrey testified that she broke her ankle and two bones in her left foot in 2011, and that the bones in her foot never healed so she cannot put weight on her left foot, or at least  not for more than half of a block.  When the ALJ noted at the hearing that her October of 2013 treating record contains no mention of a remaining foot problem, the

claimant acknowledged that it did not, but she claimed that she did indeed raise the foot problem

with her doctor, and the doctor said "because of the period of time there's nothing they can do for

it."  (R. 86-87, 92).  As for her back, she testified that the only way she obtains relief is lying

down. She claims that sitting for an hour causes her too much back pain, and that 15 minutes at a

time is the most she can bear; accordingly, she could not perform a job that requires her to sit

most of the day.  She claimed that the most she could lift was a gallon of milk. She claimed not

to take drugs that have not been prescribed for her, she does not drink alcohol, and she smokes

less than a pack a day.  (R. 88-89, 91-92).

As for her sinus surgery, she claims that the surgery provided no help for her symptoms.

(R. 90).

   *2. VE Testimony*

The VE testified that Ms. Humphrey's past relevant work was as a cashier (light and

unskilled with a specific vocation preparation of 2, meaning that training could range from a

short demonstration to one month of training) and as a fry cook (medium and unskilled with a

specific vocation preparation of 2).

The ALJ presented a hypothetical question requesting what jobs were available in the

national economy for an individual of claimant's age and work experience limited to light work

with the following additional limitations: avoiding extreme temperatures; occasional pushing and

pulling of hand and foot controls; never reaching overhead; frequently handling and fingering;

occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling;

never climbing ladders or scaffold or working in an environment of unprotected heights or

hazardous moving mechanical parts; and only performing simple tasks.  The VE responded that

the hypothetical individual could not perform the claimant's past work because the individual would need to reach overhead occasionally.  However, the individual would be able to perform the jobs of  tagger, inspector, and garment sorter, all of which would allow for a sit, stand option at will as normally performed.  In addition to those light work jobs, the VE testified that sedentary jobs exist as a table worker, inspector, or sorter with the limitations enunciated.  (R. 95-97).  The VE stated that, if the hypothetical individual missed work more than two days a month, that limitation precluded employment. (R. 98).

### D.  Function Report

In her function report dated June 6, 2012, the claimant stated that, after waking up each morning, she moves to the couch where she watches TV, but that she must continue to move around or she becomes stiff.   Her children are old enough to look after themselves and to help her.  Although her daughter does the vacuuming, sweeping, and mopping, the claimant does what she can to straighten up the house, picking up minor things and performing tasks a little at a time. She also puts clothes in the washer and dryer, but she needs help completing the laundry; her daughter folds and hangs the clothes.  When doing limited household tasks, the claimant wears a brace that her doctor prescribed for her two years ago.  Because she cannot stand for long periods of time,  she prepares fast simple meals three nights a week, with preparation taking approximately 20-30 minutes. She never does yard work, but she does go outside a couple of times a day.

Although she can drive a car without the assistance of a companion, she only does errands such as grocery shopping once every two weeks, sometimes with a cane and sometimes without one, and the shopping process takes approximately two hours because she must take breaks.  She

16

is capable of handling financial matters. The claimant's social activities are limited to talking on the phone, and getting out of the house once a week. She does not go anywhere on a regular basis.

She claims that her condition affects her ability to lift more than 5 pounds, and that reaching renders her off-balance. She claims that she cannot squat or bend; that she can stand only for short periods and walk only for short distances, 25 to 50 feet before stopping and resting. She listed the ability to sit and kneel as affected but does not explain how, and she stated that climbing stairs was almost impossible without a cane. The claimant stated that she follows spoken directions when thoroughly explained but does not follow written instructions well and cannot pay attention for a long time. Her sleep is disturbed because of discomfort from her back and leg pain. (R. 234-241).

*E. ALJ Opinion*

In an opinion dated March 26, 2014, the ALJ found, at step one of the disability determination, that the claimant met the insured status requirements of the Social Security Act through June 30, 2016, and that the claimant had not engaged in substantial gainful activity since the alleged disability onset date of January 25, 2012. (R. 62).

At step two, the ALJ found the following severe impairments that have more than a minimal effect on the claimant's ability to perform basic work functions: degenerative disc disease, post laminectomy syndrome, and status post lumbar surgery with subsequent removal of hardware; fibromyalgia; chronic opioid dependence; bronchitis; history of right hip trochanteric bursitis; hypertension; and carpal tunnel syndrome. (R. 62). However, the ALJ found that the claimant's sinusitis was a non-severe impairment.

17

At step three, the ALJ found that the claimant does not have an impairment or combination of impairments that meets the Medical Listings.  In so determining, the ALJ considered listings 1.00 for the Musculoskeletal System, 3.00 for the Respiratory System, and 11.00 for the Neurological System.

At step four, the ALJ found that the claimant had the residual functional capacity ("RFC") to perform a range of sedentary work with the following exceptions: (1) she can occasionally push and pull hand and foot controls with the upper and lower extremities; (2) she can never reach overhead with both arms; (3) she can frequently handle and finger with both hands; (4) she can occasionally climb ramps and stairs; (5) she can never climb ladders or scaffolds; (6) she can occasionally balance, stoop, kneel, crouch, and crawl; (7) she can never work at unprotected heights or around hazardous moving mechanical parts; (8) she must avoid concentrated exposure to extreme cold and heat; and (9) she is limited to simple tasks.

In making this determination, the ALJ applied the pain standard to the claimant's subjective statements regarding the intensity, persistence or functionally limiting effects of pain, finding that the objective medical record and the record as a whole did not substantiate them.  As to the back and leg impairments, the ALJ found the claimant's statements regarding her impairments partially credible.  The fact that she underwent surgery suggested that the symptoms were genuine, but that the evidence did not support the alleged intensity of the pain.  The ALJ found that the record as a whole reflected general improvement in the claimant's condition after surgery, and a substantial improvement in her functioning after surgery with medication.  The claimant repeatedly stated that she received 40-60% pain relief with medication and further stated that she suffered no medication side-effects and often reported that her activity level

18

improved. Emphasizing that the claimant had received no ER or hospital treatment for her back and leg pain since her alleged onset date, the ALJ then concluded that the "medical evidence indicates an improvement in the condition of the claimant's back and legs" and determined that the back and leg impairment was not disabling and would not prevent work as set out in the enunciated RFC.

In addition, the ALJ pointed to matters in the medical records that called into question whether the claimant needed the medication for the level of pain alleged or for an opioid dependency.  The ALJ noted that the claimant had seen a large number of physicians and had received pain prescriptions from numerous physicians, had reported no medication side effects, and that Dr. Bennett's most recent office note of January 6, 2014 had included a diagnosis of Chronic Opioid Dependency.   The ALJ pointed to the claimant's daily activities as inconsistent with the disabling pain limitations alleged and with the allegation that she spent 80% of the day lying down: getting up for the day at 7:30 AM; performing personal care with no problems, preparing simple meals; picking up around the house; placing clothes in the washer and dryer; going outside of the house twice a day; driving a car; shopping for groceries every two weeks for two hours; and paying bills and handling financial matters.  Although she claimed not to follow written instructions well, the ALJ found that claim inconsistent with her effective completion of the written function report with no indication of assistance.

Further, the ALJ noted that evidence existed that the claimant stopped working for reasons other than disabling impairments such as back pain: the claimant told Dr. Kline that she stopped work because the restaurant where she was working closed.

Finally, the ALJ stated that none of the claimant's treating or examining physicians

opined that she was disabled from working or had limitations greater than those stated in the RFC.  As to examining consultant Dr. Harris, the ALJ gave great weight to his opinion that the claimant was capable of sedentary work; however, she gave little weight to the following findings:  that the claimant could only sit for a total of 3 hours in an 8-hour workday; that she could never balance, stoop, kneel, crouch or crawl; and that she could only occasionally reach, handle, and finger, and feel.  The ALJ determined that these findings were inconsistent with Dr. Harris's examination other finding that, except for back tenderness and decrease range of motion in the back, the exam results were normal.   (R. 72)

As to the mental health professionals, the ALJ gave little weight to Dr. Estock's statement that no history of mental health treatment existed in the claimant's file, because the ALJ noted a one-time diagnosis of adjustment disorder with anxiety on August 20, 2012 accompanied by a note that the claimant had no psychological symptoms.  (R. 522-25, and prescriptions for anti-depressant at, *e.g.,* 408, 513, 516, 519, 522, 525).

The ALJ gave significant weight to Dr. Kline's opinion regarding the claimant's mental function, finding no mental impairment and only slight impairments in social, occupation, or school functioning.  The ALJ gave little weight to Dr. Kline's opinion regarding the claimant's physical functioning, given his specialty as a psychologist and the fact that he did not undertake an examination of her physical capacities.  The ALJ found that, to the extent, if any, that the claimant's adjustment disorder was ongoing and not resolved, it was a non-severe condition.  (R. 72).

Based on the RFC findings and the VE's testimony, the ALJ found that the claimant is unable to perform any past relevant work but is capable of making a successful adjustment to

other work available in the national economy, such as table worker, inspector, and sorter. Therefore, the ALJ concluded that the claimant was not disabled within the meaning of the Social Security Act from January 25, 2012 through the date of the decision.  (R. 74).

### E.  Appeal Council Decision; Records Submitted after the ALJ's Opinion

On May 21, 2014, the claimant requested a review by the Appeals Council and requested 60 days to submit additional evidence.  (R. 13).  On July 10, 2014 and in a follow-up communication on September 9, 2014, the claimant's new counsel submitted additional evidence to the Appeals Council.  Although the Appeals Council considered the briefs and two of the other new documents submitted, it stated that these documents would not provide a basis for changing the ALJ's decision.  (R. 2).

#### 1.  Evidence that the Appeals Council Considered

##### (a).  School Records:

The claimant's school records for two school years—86-87 and 87-88—reflected that she repeated seventh grade, that she was characterized as "L.D." or learning disabled, and that she received the following grades the second time she took 7th grade: 1st semester--English F/A*, Math F/A*, Social Studies 33, Science 23, Physical Education 26 and Enrichment 41; 2nd semester– English F/A*, Math F/A*, Social Studies 25, Science 10, Physical Education 10, and Enrichment 40.  The note at * stated that she is passing these L.D. Classes.  (R. 595).

##### (b).  Dr. Wilson's Report Regarding Mental Impairments

On August 14, 2014, the claimant underwent psychological testing at Gadsden Psychological Services, LLC upon referral by her attorney. Dr. David R. Wilson, a licensed psychologist, characterized her effort on the WAIS IV testing as "good" with the following

results: borderline full scale IQ of 75, with very poor verbal, nonverbal, and working memory skills.  On Wechsler Individual Achievement Test, she obtained a standard score of 75 and a grade equivalency score of 4th grade, 5th month, indicating that she has poor reading skills.  In summary, Dr. Wilson provided a diagnosis of borderline intellectual functioning, and determined that she has significant cognitive deficits limiting her occupational options to very basic or manual labor types of employment.  He further noted that her back issues may prevent her from the manual labor jobs.  (R. 597-98).

    *(c) Briefs of Counsel*

    2. *Evidence that the Appeal Council Did not Consider*

The Appeals Council stated that the medical records of Dr. Hrynkiw, Dr. Dupre, and St. Vincent's Hospital St. Clair  for treatment before the onset date and treatment after March 26, 2014 and Dr. Dupre's Physical Capacities Form did not affect the ALJ's disability decision because this treatment/evidence occurred outside the relevant period beginning January 25, 2012 and ending March 26, 2014 that the ALJ addressed in her decision. (R. 2).  The evidence in those documents is summarized below.

In April of 2014, the claimant visited Dr. Dupre, her family practitioner, complaining of stress and anxiety and losing hair.  She advised the doctor that she was suffering from depression and has a learning disability but too ashamed to ask for help.  The doctor assessed her as having insomia, moderate recurrent major depression, and adjustment disorder with anxiety as well as hypertension, lumbago, ADHD, and opioid dependence with continuous use.  He added adderal, prozac and xanax to her medications.  (R. 45-49).  The claimant stated that she had improved with prozac.  (R. 44).

In May of 2014, Dr. Michael Dupre ordered an outpatient MRI test in the claimant's lumbar region, which showed left foraminal stenosis (narrowing) existed from scarring and a bone spur formation at the L5-SI site.  The results reflected "Left foraminal stenosis from scarring and osteophyte formation L5-SI.  No recurrent disc at the laminectomy site" but did show "a small disc protrusion with annular tear at L4-5 but no stenosis."  Dr. Dupre referred her to a neurosurgeon, writing on the report: "Refer to Neurosurgeon for anal. of her Back.  Bony changes causing stenosis L5-SI.  Pt. aware."   In subsequent lab reports, the bone spur at L5-SI is characterized as "large."  (R. 18, 20, & 34).

Dr. Dupre filled out a "Physical Capacities Form" dated May 3, 2014 with the following findings: Ms. Humphrey can sit for 5 hours at a time; stand for 2 hours at a time; walk for 4 hour hours at a time; and she must be lying down, sleeping, or sitting with her legs propped at waist level or above for 3 hours during an 8-hour daytime period.  He said that the claimant could perform a task for 4 hours before needing a break.  As far as lifting abilities, she can never lift 50 pounds; occasionally lift 26-50 pounds; frequently lift 11-25 pounds, and constantly lift 10 pounds or below.  He acknowledged the existence of a medically acceptable imaging evidence of nerve root compression, which was the 5/22/14 MRI, neuro-anatomic distribution of pain, and limitation of motion in the spine but no positive straight-leg raising and no motor loss accompanied by sensory or reflex loss.  He stated that the condition limiting her function was back pain and "mild" stenosis L5-S1 and a previous laminectomy L4/L5.  He further stated that her limitations existed back to January 25, 2012.  (R. 41-2).

In June of 2014, she saw neurosurgeon Dr. Hrynkiw and complained of burning, stabbing, throbbing, tingling pain that she rated as a 7/10, and claimed that the onset of pain

occurred during road trips, sleeping, walking, lifting, twisting, turning, and bending. She also stated that the following factors made the pain worse: coughing, sneezing, exercising, lying down, walking, standing, and sitting. The past medical history section of the chart recorded that the claimant had a history of anxiety disorder, depression, fibromyalgia, high blood pressure, hypertension, and insomnia with opioid dependency and ADHD (attention deficit). The doctor also reviewed her medication and conducted a physical exam that included positive straight leg raising on her left with dorsiflexor weakness. He ordered a lumbar myelogram CT. (R. 21, 31-32).

CT results on July 8, 2014, performed on the lumbar spine for radiculopathy resulted in the following findings: "1. Postsurgical change at the L5-S1 level with a large osteophyte within the interior left neural foramen, possibly with associated mass effect [mass effect means that the disc plus spur is bulging out of its normal position] at the exiting L5 nerve root. 2. No other significant lateralizing disc abnormality or stenosis." (R. 24). A lumbar myelogram on the same day was "unremarkable." (R. 26).

On July 14, 2014, the claimant visited Dr. Hrynkiw complaining of right lumbar radiculpathy and headache after her myelogram, and to review the myelogram and CT scan results. On that day, the claimant rated her pain as 7/10. The doctor did not recommend further surgery on her back, but found that she needed an epidural blood patch and continued pain management. (R. 27-29).

## VI. DISCUSSION

The claimant raises multiple issues for review, the first two of which are: 1. whether this court should remand this matter to the ALJ for further proceedings consistent with Social

Security Ruling 16-3p; 2. whether the Appeals Council erred in refusing to review medical records submitted subsequent to the ALJ's opinion, and in failing to remand the matter to the ALJ.

A.  Social Security Ruling 16-3p and Request for a Remand

In her "Motion to Remand Pursuant to Social Security Ruling 16-3P," the claimant requested remand "pursuant to sentence 4 because the ALJ failed to assess the intensity and persistence of claimant's symptoms pursuant to Social Security Ruling 16-3p, which became effective 3/28/16." (Doc. 14, at 1).   Both the ALJ's decision in March of 2014 and the filing of the appeal in January of 2016 occurred prior to the effective date of this ruling; however, the claimant characterizes the ruling as retroactive.

SSR 16-3p announced that the Social Security Administration would eliminate the use of the term "credibility" when assessing a claimant's subjective symptoms and would "clarify that subjective symptom evaluation is not an examination of an individual's character."  Rather, the ruling "instruct[ed] our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  SSR 16-3p.

Although the claimant insists that this ruling applies retroactively, she cites no binding authtority to support her condition.  Rather, she cites *Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016), which does not endorse or otherwise support retroactive application, and *Mendenhall v. Colvin*, No. 3:14-CV-3389, 2016 U.S. Dist. LEXIS 105404 (C.D. Ill. Aug. 9, 2016), a non-binding district court case from another circuit, which found that retroactive application of the

25

ruling was "appropriate." *Id.* at *10.

This court declines to follow *Mendenhall*. The Social Security Administration did not explicitly deem this ruling retroactive, and neither the Eleventh Circuit nor any district court within this Circuit has determined that the ruling is retroactive.

However, even if the court applied SSR 16-3p to the Commissioner's opinion in this case, the ALJ did not violate its instructions. Although the ALJ used the terms "credibility" and "credible" several times in her opinion, she did not use that term to assess the claimant's character. Rather, she evaluated the claimant's symptoms, and not her overall credibility, by looking at the record as a whole and reviewing her allegations, medical records, her doctors' opinions and findings, and her activities of daily living. For all of these reasons, the court concludes that remand is inappropriate; the court WILL DENY the Plaintiff's motion to remand.

B. The Appeal Council's Denial of the Request for Review

The claimant also asserts that the Appeals Council erred in refusing to consider all new submissions after March 26, 2014 solely because the medical records were dated after the ALJ's decision. The Appeals Council specifically stated that it had considered counsel's briefs, school records, and Dr. Wilson's psychological testing records, but that this evidence did not change the result. However, the Appeals Council refused to consider the other new evidence submitted: Dr. Dupre's medical records from May 9, 2014 to May 27, 2014; Dr. Dupre's Physical Capacities Form dated May 3, 2014; Medical Records from St. Vincent's St. Clair and Radiology Report from March 11, 2008 to May 22, 2008; and Medical Records from Dr. Zenko Hryniw and Imagaing Results from May, June, and July of 2014. The Council explained as follows:

The Administrative Law Judge decided your case through March 26, 2014. This

new information is about a later time. This new evidence also includes
information from before the time you allege you became disabled.  Therefore, it
does not affect the decision about whether you were disabled between the time
you allege you became disabled and March 26, 2014.

(R. 2).

"With a few exceptions, the claimant is allowed to present new evidence at each stage of

this administrative process," including the stage of Appeals Council review.  *Ingram v. Comm'r

of Soc. Sec. Admin.,* 496 F.3d 1253, 1261 (11th Cir. 2007).  Although the Appeals Council has

discretion not to review the ALJ's determination, *see* 20 C.F.R. § 416.1470(b), the Council

"must consider new, material, and chronologically relevant evidence that the claimant submits."

*Ingram,* 496 F.3d at 1261; *see also* 20 C.F.R.  §§ 404.970(b), 416.1470(b).  "When the Appeals

Council refuses to consider new evidence submitted to it and denies review, that decision is

subject to judicial review . . . ."  *Keeton v. Dep't of Health & Human Servs.,* 21 F.3d 1064, 1066

(11th Cir. 1994).  A federal court applies *de novo* review when reviewing the Appeals Council's

refusal to consider additional evidence.  *Washington v. Comm'r Soc. Sec. Admin.,* 806 F.3d 1317,

1320-21  (11th Cir. 2015).  Accordingly, this court will determine in a *de novo* review whether

the additional evidence that the claimant submitted to the Appeals Council was new, material and

chronologically relevant, and thus, whether the Appeals Council's failure to consider it was legal

error.

The new submission to the Appeals Council  included the Physical Capacities Form from

Dr. Michael Dupre, the claimant's treating physician during most, if not all, of the time period

relevant to the ALJ's disability determination.  The form was dated May 3, 2014, after the ALJ's

opinion, and contains Dr. Dupre's physical capacities evaluation that was not previously

submitted to the ALJ in another form.  The court FINDS that this evaluation was non-cumulative and was new evidence.

Although the form was dated after the ALJ's opinion, Dr. Dupre specifically stated that the limitations listed on the form existed as of her onset date of January 25, 2012. Therefore, despite the date of the form, the court FINDS that the doctor's opinion covered the time period of the disability determination and was chronologically relevant.

The court also FINDS that Dr. Dupre's opinion on the Physical Capacities Form was material.  New evidence is material if "there is a reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir. 1987); *Washington,* 806 F.3d at 1321 (quoting the language with approval as the definition of materiality in a similar context).  Because the form stated that the doctor would expect Ms. Humphrey, because of her medical conditions, to "be lying down, sleeping, or sitting with legs propped at waist level" for 3 hours in an 8 hour daytime period (R. 41), this opinion was contrary to the ALJ's determination that the claimant could perform sedentary work for an 8-hour workday.  Thus, if accepted, a reasonable possibility existed that Dr. Dupre's opinion would change the ALJ's result.  The court notes that Dr. Dupre is the second examining physician who has opined that the claimant must rest for at least 2 hours in an 8-hour workday; Dr. Rex Harris, who examined the claimant upon the Commissioner's request, found that she could sit, stand and walk for a combined total of 6 hours in an 8-hour workday and must rest for the other 2 hours because of her back pain.  Therefore, both the treating physician and the examining orthopedist agreed that the claimant must rest at least 2 hours per workday, and no other doctor in the record specifically says otherwise.  Under these circumstances, Dr. Dupre's opinion on the Physical

Capacities Form was new, material, and chronologically relevant, and the Appeals Council's failure to consider it was legal error.

The government argues that Dr. Dupre's form was not chronologically relevant because he "was somewhat equivocal as to whether the functional limitations in his Physical Capacities Form existed back to January 2012." The government stated that, when answering the question "Did these limitation exist back to 1/25/12," the doctor "first checked 'No' to indicate the limitations did not exist back to January 2012" but then "apparently changed his mind, crossing out the two "No" answers. . ." (Comm'r Br., Doc. 23). However, this court refuses to follow the government's lead in such speculation. The answer to the question "Did these limitations exist back to 1/25/12" is clearly marked "Yes" with a check, and no doubt exists from looking at the form what the doctor's final answer is.

The government also argues that the case of *Washington v. Comm'r of Soc.Sec. Admin.,* does not require this court to determine that the evidence not considered was chronologically relevant or compels a remand. In *Washington*, the Eleventh Circuit addressed a case in which the Appeals Council had refused to consider additional evidence that the claimant submitted after the ALJ's opinion, including a medical opinions, because the Council found that such opinions were dated after the ALJ's opinion and were not chronologically relevant to the disability determination. The district court affirmed. The Court of Appeals found that the medical opinions were material and chronologically relevant even though the date of the doctor's examination and psychological evaluation occurred several months after the ALJ's opinion. Noting that the doctor reviewed medical records dating to the time period prior to the ALJ's decision and further noting that no evidence existed that the claimant's cognitive skills had

declined after the ALJ's opinion, the court found the doctor's opinion to be chronologically relevant even though the doctor never explicitly stated that his opinion related back to the period before the ALJ's decision.   Thus, the Eleventh Circuit reversed the district court's judgment in favor of the Commissioner and remanded with instructions for the district court in turn to remand the case to the Commissioner to consider the new evidence. *Washington,* 806 F.3d at 1321-22.

The instant case provides an even stronger case than *Washington* for remand.  Here the doctor providing the opinion treated the claimant during the relevant time period and explicitly stated that his opinion related back to the relevant time period.

For all of these reasons, the court FINDS that Dr. Dupre's opinion in the May 2014 Functional Capacities Form is new, material, and chronologically relevant evidence, and that the Appeals Council was required to consider it; its refusal to do so was an error of law.

As to the other new medical records not considered, the government argues that the claimant has not proven that they are chronologically relevant because they are dated after the ALJ's opinion, and that she has not proven that they are material.  The Commissioner specifically noted that the imaging showed back impairments but did not show that the claimant is more limited than the ALJ found. (Comm'r Br. Doc. 23-24).

As to the post-March 2014 medical records of Dr. Dupre, Dr. Hrynkiw and St. Vincent's St. Clair, the court FINDS that these records present new and non-cumulative evidence to the extent that they provide evidence of a post-surgical problem at the L5-SI site, *in addition to* the old fusion.  In 2012, Dr. Mallempati focused more on the L4/5 site as the most likely genesis of pain, although he considered the possibility that the "pain might be coming from the surgery area itself."  (R. 502).  However, the May 2014 MRI, occurring only two months after the ALJ's

opinion, did show a bone spur at the L5-SI fusion site, and by its nature, a bone spur is a growth that occurs over time and would reasonably relate back to the relevant time period.  The July 2014 CT scan of the lumbar scan characterizes the bone spur formation at the surgery site (L5-SI) as "large" and indicated that it is "encroaching on the exiting L5 nerve root."  The court FINDS that the May and July 2014 imaging and subsequent interpretations of them would be chronologically relevant.

As to whether the evidence is material, the fact that the spur was characterized as "large" and "encroaching on the L5 nerve root" would be consistent with the claimant's assertions that her pain was significant and worsening—contrary to the ALJ's findings that the medical evidence indicated "a general improvement" in her condition.  (R. 70-71).  The court acknowledges that imaging revealing back impairments does not necessarily reveal functional limitations; however, a reasonable possibility exists that the new evidence would change the outcome of the ALJ's pain standard determination.  Therefore, the court FINDS that the new evidence is material.

Accordingly, the court WILL REMAND this case to the Commissioner for consideration of this new evidence in conjunction with all the other evidence in the record.  Because of this ruling, the court need not and does not address the other assertions of error.  The court notes, however, that it is troubled by the ALJ's giving little weight to many findings of the government's own consulting/examining physician, Dr. Harris, when no examining medical professional in the record contradicted Dr. Harris.  Although the ALJ stated that no examining physician indicated that the claimant is disabled or has limitations greater than those in the RFC, that statement is incorrect: Dr. Harris was an examining physician and his findings were that the claimant could only sit, stand, and walk a combined total of 6 hours in an 8-hour workday, and

31

rest for the 2 remaining hours, and he also found other limitations greater than in the RFC (such as *never* balancing, stooping, kneeling, crouching, and crawling).

## VII.  CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED for reconsideration of the additional evidence presented to the Appeals Council but rejected.  The court will enter a separate Order consistent with this opinion.

Dated this 23rd day of March, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE